MILLER, Appellee,

v.

BARRY, Admr., Bureau of Workers' Compensation, Appellee;

Sears, Roebuck & Company, Appellant.

[Cite as *Miller v. Barry* (1992), 81 Ohio App.3d 393.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–966.

Decided June 16, 1992.

*Stewart Jaffy & Assoc., Renny J. Tyson* and *Sue A. Fauber,* for appellee Sun Miller.

*Gibson & Robbins–Penniman* and *J. Miles Gibson,* for appellant.

PETREE, Judge.

Appellant Sears, Roebuck & Company appeals from the judgment of the Franklin County Court of Common Pleas, where a jury found in favor of appellee Sun Miller in this R.C. 4123.519 occupational disease trial. Appellant assigns two errors for review:

"I. Appellant Sears, Roebuck & Company was entitled to a directed verdict at the close of appellee's case.

"II. The trial court should not have allowed Betty Briggs and Nancy Osterloh, non-expert witnesses, to testify regarding their jobs and their physical ailments."

In the first assignment of error, appellant maintains that appellee did not present sufficient evidence to demonstrate that her workers' compensation claim for "adhesive capsulitis right shoulder" qualified as an unscheduled occupational disease under R.C. 4123.68. Therefore, appellant argues that the trial court should have directed a verdict against appellee.

In deciding a motion for a directed verdict under Civ R. 50(A), the trial court must construe the evidence most strongly in favor of the nonmoving party. The legal question presented by the motion is whether there is sufficient evidence to support the nonmoving party's claim. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935.

There is not sufficient evidence to support the nonmoving party's claim if reasonable minds can only conclude against the nonmoving party on a determinative issue.

R.C. 4123.68 provides workers' compensation benefits for various occupational diseases. In addition to setting forth a schedule of some twenty-seven compensable occupational diseases, the statute also provides a catchall definition for compensable unscheduled occupational diseases. This definition states:

"As used in this section and Chapter 4123. of the Revised Code, 'occupational disease' means a disease contracted in the course of employment, which by its causes and the characteristics of its manifestation or the condition of the employment results in a hazard which distinguishes the employment in character from employment generally, and the employment creates a risk of contracting the disease in greater degree and in a different manner than the public in general."

The current statutory definition of an unscheduled occupational disease, which was enacted in 1986, is worded differently from previous versions of the statute.[1] It is abundantly clear that the current definition was drawn from the leading Ohio case on the subject, *State ex rel. Ohio Bell Tel. Co. v. Krise* (1975), 42 Ohio St.2d 247, 71 O.O.2d 226, 327 N.E.2d 756.[2] The only arguably meaningful change is the legislature's deletion of the phrase "peculiar to the claimant's employment" from the *Krise* syllabus.

In this case, appellant concedes that there was some evidence that appellee contracted adhesive capsulitis during the course of her employment and that her employment resulted in a greater hazard of contracting an occupational disease. However, appellant does not concede that appellee's employment created a risk of contracting adhesive capsulitis in a greater degree and in a different manner than the public in general. Appellant contends that appellee

---

1. For instance, the previous definition of occupational disease, contained in former R.C. 4123.68(BB), read:
   "A disease peculiar to a particular industrial process, trade, or occupation and to which an employee is not ordinarily subjected or exposed outside of or away from his employment."

2. The syllabus of the *Krise* case states:
   "An occupational disease is compensable under R.C. 4123.68(BB) where the following criteria exist: (1) The disease is contracted in the course of employment; (2) the disease is peculiar to the claimant's employment by its causes and the characteristics of its manifestation or the conditions of the employment result in a hazard which distinguishes the employment in character from employment generally; and (3) the employment creates a risk of contracting the disease in a greater degree and in a different manner than in the public generally."

did not offer any evidence to establish these necessary elements of the statutory definition.

To be sure, appellee has the burden of establishing that a claimed occupational disease satisfies the requirements of R.C. 4123.68. *State ex rel. Gen. Motors Corp. v. Indus. Comm.* (1975), 42 Ohio St.2d 255, 258, 71 O.O.2d 230, 232, 327 N.E.2d 761, 764. To meet this burden in this case, appellee presented the following evidence at trial.

Appellee was born in South Korea and came to the United States in 1970. Although she is now a citizen here, she still has great difficulty in speaking and understanding English and has little ability to read and write. She attended high school in South Korea but has had no academic training in the United States.

Appellee began working for appellant at the Sears Distribution Center in 1976. She worked there as a direct-to-customer packer for nearly eleven years, wrapping customer catalog orders for shipping.

Direct-to-customer packers worked eight hours per day lifting, bundling, and taping various goods. These goods included relatively light items like clothes or blankets, and relatively heavy items like tools. During the months approaching Christmas, and for about a month after the holiday, the workday increased. At these times of the year, appellee worked as many as twelve hours per day, seven days per week, packaging customer orders.

The packing process was very strenuous and performed under intense time pressure. Appellee worked all day long, stooped over in a metal cage. There was a chute above the cage, which would periodically drop twenty-two customer orders onto a metal table in front of her. This group of orders was known as a "schedule."

Appellee had thirty-five minutes to pack the schedule. This gave her about a minute and a half to handle each customer order. In that time, she had to find the order on the table, lift it, package it, and then carry it over to a shipping bin. Some packages had to be wrapped, bagged, or boxed and then taped and tied. Large items had to be double or triple tied. Some items had to be handled on the floor because they were too big to sit on the metal table. An order could weigh up to one hundred pounds. Heavier orders had to be broken down into packages of forty pounds or less.

After the thirty-five minutes to complete the schedule elapsed, another schedule would drop down on the table. Packers had to keep up with the schedule or they would be "written up" by supervisors. If they could not keep up then they were fired. So, packers had to cut corners and make up time any way they could. They were in constant motion.

Appellee is five-feet, one-inch tall. She weighs eighty-seven pounds. Consequently, while working at the Sears Distribution Center, she repeatedly lifted over one hundred percent of her body weight each day in the metal cage. She used her shoulder over a hundred times per schedule. This could mean over one thousand strenuous shoulder movements per day. And this occurred daily for over a decade.

The demanding physical nature of the work left appellee sweaty, exhausted, and sore at the end of the workday. Her upper body, which did most of the work, ached badly. After work, she went home, put liniment on her shoulder and neck, and simply fell asleep.

Appellee's shoulder pain gradually worsened over the years. Eventually, she sought medical attention. She told her employer that her shoulder ached. She was then sent to a Sears medical doctor named Dr. Hurt. He told her to put a heating pad on it, he gave her some pain pills, and then he sent her back to work. Appellee continued to get worse and eventually could not work anymore.

Dr. Cy Young, appellee's treating physician, testified as an expert at trial. He was amazed that such a small woman could lift so much and work so hard. He opined that appellee's adhesive capsulitis impairment resulted from her extreme overuse of the shoulder muscles and the joint. He described the word "capsulitis" as a general term associated with overuse of a joint structure.[3]

Despite the extreme manual labor that appellee was required to perform and the indisputable damage that was done to her shoulder because of it, appellant contends that appellee failed to meet her burden in this case.

A large part of appellant's argument in this connection is that appellee did not present probative expert evidence in this case. First, appellant challenges Dr. Young's testimony because he did not make any distinction between occupational "injury" and occupational "disease" in formulating his opinion. We find this argument to be without merit.

In *Varney v. Kroger Co.* (Aug. 16, 1988), Franklin App. No. 87AP–825, unreported, 1988 WL 87158, this court considered an occupational disease claim involving a back condition which had developed over a period of time from repetitive lifting. We recognized that the Ohio Supreme Court has

---

**3.** A capsule is a structure, such as the shoulder, which is made up of a number of different structures, including nerves, tendons, muscles, and bursae. Overuse of the structure causing inflammation is associated with the suffix "itis." Hence, inflammation of the nerve is called "neuritis," inflammation of the tendon is called "tendinitis," inflammation of the muscle is called "myositis," and inflammation of the bursae is called "bursitis."

muted the distinctions between occupational disease and industrial injury of gradual onset. Hence, evidence regarding one can prove the other. *Id.* at 7.

■ Second, appellant challenges Dr. Young's conclusions because the doctor admitted that adhesive capsulitis has not been characterized as an occupational disease in any medical literature. However, in the *Varney* case, this court specifically held that medical definitions are not controlling. R.C. 4123.68 supplies the legal definition of "occupational disease" under the workers' compensation law. *Id.* at 7–8.

■ Third, appellant challenges Dr. Young's testimony because he admitted that anyone in a lifting occupation could get adhesive capsulitis. Essentially, appellant's argument is that it was necessary for the expert to conclude that appellee's risk of contracting adhesive capsulitis was "peculiar" to her particular employment. We disagree.

As noted above, the *Krise* syllabus contained a phrase with the word "peculiar" in it, which conjures up notions of the "peculiar-risk" test that was prevalent in early workers' compensation law. However, a careful reading of the *Krise* case shows that the word "peculiar" was not used in the sense that the claimant must suffer some unique risk applicable only to the claimant's job. See *State ex rel. Republic Steel Corp. v. Indus. Comm.* (1980), 61 Ohio St.2d 193, 15 O.O.3d 216, 399 N.E.2d 1268. Accordingly, the fact that other employees in the same or similar occupations may contract the disease is not dispositive.

Thankfully, the legislature did not include the word "peculiar" in the current version of the statute, which should clear up some of the confusion and litigation in this area of the law. Under the current statute, a physician need not testify that the claimant's risk of contracting the occupational disease was a peculiar one. The physician need only testify that the employee was subject to a greater or increased risk under the circumstances. That is, if the claimant, in his or her own daily activities, was more apt to contract the disease, then an increased risk is evident that would satisfy the statute. *Patterson v. Connor* (1984), 19 Ohio App.3d 304, 306, 19 OBR 476, 478, 484 N.E.2d 240, 242; *Hoops v. Mayfield* (1988), 44 Ohio App.3d 50, 52, 541 N.E.2d 113, 114.

■ The statute contemplates a comparison of the claimant's risk of contracting the disease to that which obtains in employment generally and that which pertains to the public. At trial, appellant cross-examined Dr. Young to establish that appellee's risk of contracting the disease was no different from anyone else's risk, if he did the same work as she. This theory again conjures up notions of the discredited peculiar-risk test of the early workers' compensa-

tion law. Under this type of analysis, one could make the ludicrous argument that a claimant's risk of contracting radiation poisoning is no different from anyone else's risk—if they had been exposed to uranium as well. As one eminent scholar has noted, this type of analysis in workers' compensation law has been consigned to a "well-deserved oblivion." [4] Again, this type of analysis is not the law of Ohio. Appellant's essential complaint about appellee's evidence is that Dr. Young never testified about the risks attendant to the public and in employment generally. Appellant's argument is that there was no expert evidence in this regard.

R.C. 4123.68 does not contain any express language requiring expert testimony in every occupational disease case on these points. Moreover, it has been held that expert testimony is not always necessary to assist the trier of fact in comparing the claimant's risk to the risk in employment generally or the risk of the public. *Bayus v. Mayfield* (Jan. 27, 1992), Montgomery App. No. 12477, unreported, at 5, 1992 WL 10924.

In assessing the sufficiency of the testimony presented in light of the statutory standards, we must be mindful of the fundamental objective of the occupational disease test itself. Initially, because only "injuries" were covered under the workers' compensation law, occupational diseases—which by their very nature result from gradual exposure or onset—were not compensable under Ohio law. The object of occupational disease law was therefore to distinguish between accidental injuries and gradually developing conditions. See, generally, Fulton, Ohio Workers' Compensation Law (1991) 163–166, Sections 8.1 and 8.2. By contrast, today occupational diseases are expressly allowed by R.C. 4123.68. Now the object of the law is to distinguish between occupational diseases and ordinary diseases of life that have nothing to do with occupational hazards.

Consequently, it has been held that ordinary wear and tear of the body is not an occupational disease. *Popham v. Indus. Comm.* (1966), 5 Ohio St.2d 85, 34 O.O.2d 187, 214 N.E.2d 80 (arthritis); *Job v. Cleveland Dance Ctr.* (1989), 62 Ohio App.3d 678, 577 N.E.2d 396 (arthritis). Cf. *Mull v. Jeep Corp.* (1983), 13 Ohio App.3d 426, 13 OBR 514, 469 N.E.2d 923 (heart attack). However, courts have recognized that wear and tear caused by extraordinary repetitive motion may qualify as an occupational disease. See *Gresham v. Gen. Motors Corp., Inland Div.* (1990), 66 Ohio App.3d 837, 586 N.E.2d 1127 (carpal tunnel syndrome).[5] In fact, R.C. 4123.68(R) expressly schedules the

---

4. 1 Larson, The Law of Workmens' Compensation (1990) 3–4, 3–5, Sections 6.20 and 6.30.

5. We note that this court discussed an occupational disease claim for carpal tunnel syndrome in *State ex rel. U.S. Playing Card Co. v. Indus. Comm.* (1976), 49 Ohio App.2d 351,

conditions "tenosynovitis" and "prepatellar bursitis," which are "due to fre-
quently repetitive motions or vibrations * * * or continued pressure."

■ In *Marino v. Suburban Motor Freight, Inc.* (Feb. 22, 1984), Summit
App. No. 11291, unreported, 1984 WL 4772, the Ninth District Court of
Appeals found that a directed verdict in favor of the defendant was warranted
in an occupational disease case where a truck driver claimed that unloading
trucks had hurt his shoulder. His physician diagnosed tendinitis, a torn rotor
cuff, degenerative arthritis, and degenerative capsulitis in the shoulder. De-
spite this apparent ruling on capsulitis, *Marino* should not control our decision
here. The sparse facts set forth in that case do not lend themselves to any
comparison with this case. The court appeared to decide the *Marino* case on
the basis that the lifting stress the truck driver was subject to was quite
ordinary. In any event, we need not follow that case, as it is only unreported
authority.

We find that Dr. Young's testimony, along with the other facts presented,
was sufficient to establish that appellee was more apt to contract adhesive
capsulitis than employees in general and the public as well. Dr. Young
clearly testified that, given his understanding of the employment and from the
history taken from appellee, appellee was subject to a significantly greater
risk of contracting adhesive capsulitis due to her years of repetitive move-
ments. He said it was "certainly far and beyond what anybody does on an
average day's work at home." While he acknowledged that people could get
the condition from suffering an injury in the backyard followed by disuse, he
said, "in my 18 and a half years [of practice] I haven't seen anybody that gets
this kind of injury casually. They have to be doing something very specific or
repetitive long term, again and again and again."

■ Further, we find that appellee presented sufficient evidence that her
employment subjected her to a risk of contracting the disease in a different
manner than the general public. Concededly, the public in general does not
contract adhesive capsulitis in a similar manner. Appellee was an eighty-
seven pound woman repetitively lifting more than her own body weight and
using her shoulder hundreds of thousands of times per year in this destructive
manner for over a decade. One cannot even argue that this is comparable to
anything done in ordinary life. There is no question that appellee's disease
was the result of an occupational hazard. When conditions of employment
significantly increase the risk of a disease, then necessarily the risk of

---

3 O.O.3d 422, 361 N.E.2d 509. However, that case's conclusion that the claimant did not
prove that carpal tunnel syndrome was an occupational disease was unnecessary to the
decision and also appeared to be based upon a lack of evidence in that particular case.

contracting the disease is different from that which the public is subject to in ordinary life.[6]

For the foregoing reasons, appellant's first assignment of error is not well taken.

In the second assignment of error, appellant contends that the trial court should not have allowed the testimony of Betty Briggs and Nancy Osterloh, who were appellee's coworkers. Appellant claims that it was prejudicial to allow these direct-to-customer packers to testify about how their shoulders ached at the end of the day. Appellant contends that an improper inference arose that these individuals also suffered adhesive capsulitis. Appellant argues that such an inference would be improper without medical testimony to connect the alleged shoulder ailments to adhesive capsulitis.

It is basic that the admission or exclusion of evidence is within the discretion of the trial court. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 17 O.O.3d 98, 407 N.E.2d 490. Hence, this court may not reverse unless the trial court abused its discretion.

First, we must note that the trial court indicated that these individuals' testimony concerning their job duties and the physical stress of the job would aid the jury because of appellee's inability to communicate in English. Indeed, the record demonstrates that appellee speaks in broken English and had difficulty responding to questions from counsel. Second, appellant tried to attack appellee's credibility in an effort to show that her job was really not that strenuous. The testimony of Briggs and Osterloh rebutted this attack and was relevant and useful, given the language barrier. Third, appellant opened the door to any inference about whether these individuals had adhesive capsulitis when defense counsel tried to impeach them for bias by asking whether they had brought claims against appellant and what type of claims they had brought.

Last, we find no abuse of discretion in the trial court's exclusion of appellant's questions to the company nurse about how many shoulder injury complaints had been filed against appellant. We do not see how such safety history testimony would be relevant in this case. Moreover, this was not assigned as error herein.

---

6. Under appellant's interpretation of the statute, appellee was obligated to show that she contracted the disease in a biologically unique way. It is difficult to understand how anyone could ever establish an occupational disease under such a standard. Employees, as human beings, contract diseases in the biological sense in the same manner as the public does. There is nothing in R.C. 4123.68 which evidences an intent to cover only freak occurrences in nature.

Accordingly, appellant's second assignment of error is not well taken.

For the foregoing reasons, appellant's assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

BOWMAN and TYACK, JJ., concur.